RECEIVED
USDC, WESTERN DISTRICT OF LA.
TONY R. MOORE, CLERK
DATE 1/20/2010
BY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| DEVON ENERGY PRODUCTION CO., L.P., ET AL. | CIVIL ACTION NO. 04-2093 |
| VERSUS | JUDGE ROBERT G. JAMES |
| GAIL NORTON, SECRETARY, DEPARTMENT OF THE INTERIOR, ET AL. | MAG. JUDGE MARK L. HORNSBY |

RULING

This case involves a dispute between the United States and the State of Louisiana ("Louisiana"), among others, over title to certain alleged relictions and/or accretions ("relictions")[1] surrounding the shore of Lake Bistineau.

On November 10, 2009, Louisiana filed a Motion for Summary Judgment [Doc. No. 142] asserting that Louisiana law applies as the rule of decision to determine ownership of the alleged relictions and that the United States is estopped from claiming ownership of the alleged relictions. On the same day, Cohort Energy Co. ("Cohort"), lessees of some of the property at issue in this case, also filed a Motion for Summary Judgment [Doc. No. 144] asserting that the United States is estopped from claiming ownership of the alleged relictions.

For the following reasons, Louisiana's Motion for Summary Judgment [Doc. No. 142] is GRANTED IN PART and DENIED IN PART. It is GRANTED IN PART, and the Court finds that

---

[1] "An accretion occurs where bits of rock, sand, and dirt accumulate on a shore and push the water line back, thereby creating new land. A reliction occurs where land is exposed by the imperceptible recession of water. The terms are often used interchangeably, and law relating to accretions applies in all its features to relictions." *California ex rel. State Lands Comm'n v. United States*, 805 F.2d 857, 860 n.1 (9th Cir. 1986) ("California II"). For purposes of this Ruling, the Court will refer to relictions and/or accretions as "relictions."

Louisiana law applies as the rule of decision to determine ownership of the alleged relictions. It is DENIED IN PART, and the Court finds that the United States is not estopped from claiming ownership of the alleged relictions. The Court, however, declines to rule whether Louisiana owns title to the alleged relictions under Louisiana law. For the same reasons, Cohort's Motion for Summary Judgment [Doc. No. 144] is DENIED.

I.  **FACTUAL AND PROCEDURAL HISTORY**

Lake Bistineau ("the lake") is located in Bienville, Bossier, and Webster Parishes. It is one of several "raft lakes" formed some time before 1812 when the Red River became blocked by an accumulation of trees and other debris ("the Great Raft").

When Louisiana joined the Union in 1812, it took title to the bed of the lake up to the lake's ordinary high water mark ("OHWM")[2] as an incident of sovereignty.[3] The United States retained title to certain lands surrounding the lake.[4]

Between 1815 and 1839, the United States General Land Office ("GLO") conducted surveys of the lake. In its surveys, the GLO established a meander line that represented, as it existed in 1812,

---

[2] An ordinary high-water mark is a "line that [water] impresses on the soil by covering it long enough to deprive it of agricultural value." BLACK'S LAW DICTIONARY 1623 (8th ed. 2004).

[3] "[T]he 13 original States, by virtue of the sovereignty acquired through revolution against the Crown, own the lands beneath navigable inland waters within their territorial boundaries, and . . . each subsequently admitted State acquired similar rights as an inseparable attribute of the equal sovereignty guaranteed to it upon admission." *United States v. Louisiana*, 363 U.S. 1, 15 (1960) (citing *Pollard v. Hagan*, 44 U.S. 212 (1845)). The parties do not dispute that the lake was navigable when Louisiana joined the Union in 1812.

[4] Light yellow areas on a BLM map submitted by Louisiana represent lands retained by the United States. [Doc. No. 142, Exhibit X]. Purple areas on the map represent the United States' mineral interests reserved in conveyances of lands to private parties after 1812. *Id.*

the lake's OHWM of 148.6 feet ("1812 OHWM").[5] The United States used these surveys to identify the boundaries of property it disposed of in patents and rights it granted in leases.

Between 1872 and 1873, Lieutenant E. A. Woodruff of the United States Army Corps of Engineers supervised the removal of the Great Raft.[6] After removal, water flowed more freely in the Red River causing a recession of the lake's water level. This recession caused the OHWM to decrease to a level (the "pre-1934 OHWM") represented by a red line on a Bureau of Land Management ("BLM")[7] map submitted by Louisiana. [Doc. No. 142, Exhibit X]. Although the parties dispute the exact level of the pre-1934 OHWM, this issue is presently not before the Court.

In 1934, Louisiana dammed the southern end of the lake causing the OHWM to increase close to its 1812 level.

Between 1929 and 1957, Louisiana applied three times under the Louisiana Swamp Act of 1849 and the Swamp Lands Act of 1850 for the United States to grant Louisiana title to several sections of the bed of the lake. These sections are not the same sections claimed by the United States in the instant suit. All three applications were denied by the GLO and BLM for the stated reason that title to the bed of the lake up to the 1812 OHWM had already vested with Louisiana as an incident of sovereignty.

Between 1939 and 1967, the GLO and the BLM re-surveyed portions of the lake. The

---

[5] "The high-water mark is usu[ally] computed as a mean or average . . . ." BLACK'S LAW DICTIONARY 1623 (8th ed. 2004). For purposes of this ruling, the Court will use the mean high water elevation as the OHWM.

[6] The Great Raft was briefly removed by Captain Henry Shreve in the 1830s. However, it reformed in 1839.

[7] In 1946, the GLO merged into the BLM.

3

surveys state that the 1812 OHWM represents the boundary of United States property.

The United States now claims that it owns the property between the 1812 OHWM and the pre-1934 OHWM, the alleged relictions. Louisiana, on the other hand, contends that it owns the bed of the lake up to the 1812 OHWM.

On November 10, 2009, Louisiana and Cohort filed separate motions for summary judgment [Doc. Nos. 142 & 144]. Louisiana asserts that Louisiana law applies as the rule of decision to determine ownership of the alleged relictions. Louisiana also asserts, as does Cohort, that the United States is estopped from claiming ownership of the alleged relictions.

On November 27, 2009, Anderson Land & Minerals, LLC, filed a response [Doc. No. 150] stating that it supports Louisiana's motion.

On December 1, 2009, the United States filed a response [Doc. No. 151] to Louisiana's and Cohort's motions for summary judgment.

On December 10, 2009, Louisiana filed a reply [Doc. No. 156] to the United States' response. On the same day, the Court ordered [Doc. No. 157] Louisiana to file a supplemental memorandum and allowed an opportunity for all parties to respond.

On December 16, 2009, Cohort filed a reply [Doc. No. 165] to the United States' response.

On December 23, 2009, Louisiana filed a supplemental memorandum [Doc. No. 166].

On January 6, 2010, the United States filed a response [Doc. No. 167] to Louisiana's supplemental memorandum.

On January 15, 2010, Louisiana filed a reply [Doc. No. 172] to the United States' response.

II.   LAW AND ANALYSIS

A.   **Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet its initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

B.   **Choice of Law**

Louisiana asserts that Louisiana law applies as the rule of decision to determine ownership of the alleged relictions. Whether Louisiana law applies as the rule of decision requires a two-tiered

5

inquiry:

> First, we must decide whether federal law controls or state law applies of its own force. Second, if we decide that federal law controls, we must determine the content of the applicable federal law. Specifically, we must decide whether to adopt state law as the federal rule of decision.

*Waterfowl Ltd. Liab. Co. v. United States*, 473 F.3d 135, 142 (5th Cir. 2006).

### *1.    Whether Federal Law Controls or State Law Applies of its Own Force*

Federal law controls in disputes over title to lands owned by the United States. *See California ex rel. State Lands Commission v. United States*, 457 U.S. 273, 283 (1982) ("California I"). This rule has long been recognized by the United States Supreme Court. *See Hughes v. Washington*, 389 U.S. 290, 291 (1967) ("[A] dispute over title to lands owned by the Federal Government is governed by federal law . . . ."); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 670 (1979) (holding that federal law controls to determine who owns alleged relictions to navigable waterways where the United States never parted with title and its interest in the property continues).

Louisiana cites two Louisiana Supreme Court cases for the proposition that Louisiana law controls of its own force. *State v. Standard Oil Co. of La.*, 113 So. 867 (La. 1927); *Sapp v. Frazier*, 26 So. 378 (La. 1899). However, those cases involved property disputes between Louisiana and private property owners, not the United States. *See Standard Oil*, 113 So. at 337-38; *Sapp*, 26 So. at 379-80. According to *California I*, this distinction precludes a finding that state law applies of its own force. *California I*, 457 U.S. at 281 (citing *Wilson*, 442 U.S. at 670).[8]

---

[8]Louisiana also argues that Louisiana law controls of its own force because, "[a]s evidenced in reports and decisions by federal agencies dating back to 1908, the federal government has applied Louisiana law when property disputes arose over raft lakes between the State of Louisiana and the federal government thereby creating federal precedent and policy." [Doc. No. 170]. Louisiana, however, fails to cite authority for the proposition that reports and decisions by federal agencies have any effect on this choice of law question.

### 2. *Whether the Court may Inquire into Whether Louisiana Law Should be Adopted as the Rule of Decision*

Next, the Court must determine whether the Court may inquire into whether state law should be adopted as the rule of decision.

The United States contends that this case is controlled by *California I* where the United States Supreme Court refused to adopt state law as the rule of decision. In *California I*, the United States owned coastal uplands abutting state-owned submerged tidelands. *California I*, 457 U.S. at 275-76. The United States claimed that it held title to alleged relictions along the shore because Congress, through Section 5 of the Submerged Lands Act ("SLA"), excepted relictions to lands underneath the territorial sea from its grant to the States. *Id.* at 283. The Court held that, because Congress through the SLA "ha[d] already addressed the issue of [relictions] to federal land," state law could not be adopted as the rule of decision to divest the United States of ownership to the alleged relictions. *Id.* at 283-84. Applying the federal common law rule that "[relictions], regardless of cause, accrue to the upland owner," the Court held that the alleged relictions were in fact relictions as defined by federal common law and that the United States held title to the relictions. *Id.* at 285.

Louisiana argues that *California I's* holding was limited to submerged tidelands, while this case deals with an inland waterway. This argument presents an issue of first impression in the Fifth Circuit. Only one court has addressed this issue. In *California II*, a case directly on point, California owned property underlying a navigable lake. *California II*, 805 F.2d at 861. The United States owned property along the lake's shore and claimed title to alleged relictions surrounding the shore. *Id.* at 859-60. Citing *California I*, the Ninth Circuit Court of Appeals held that, because "the United States' claim [was] based in part on section 5(a) of the [SLA]," the Court could not adopt state law

7

as the rule of decision. *Id.* at 861. The Court addressed the same argument that Louisiana makes in this case:

> California argues that section 5(a) does not affect the choice of law determination in disputes involving inland waterways. It contends that because the Act merely *confirms* the states' title to submerged lands beneath their inland waterways, whereas it vests title in the states to submerged coastal lands, it has no 'substantive legal effect' with regard to inland waterways. This analysis is erroneous. Section 5(a) excepts from the operation of section 3 federal lands and all [relictions] thereto. That 'substantive legal effect' is independent of the distinction in section 3 between a grant and a confirmation of the states' title. Congress' authority to except [relictions] from its confirmation of title to submerged inlands is no different from its authority to except [relictions] from its grant of title to submerged coastal lands. Section 5(a) therefore has the same choice of law consequence in an inland waters dispute as in a coastal waters dispute.

*California II*, 805 F.2d at 862.

The Court disagrees with the holding in *California II* that Section 5(a) of the SLA has "the same choice of law consequence in an inland waters dispute as in a coastal waters dispute." *Id.* Here, unlike in *California I*, there are no statutory directives that mandate the use of a federal rule of decision. While the holding in the United States Supreme Court case *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977), does not apply to the instant case "where the [United States] has never parted with title and its interest in the property continues,"[9] the following in that case is instructive:

> [T]he [SLA] did not alter the scope or effect of the equal-footing doctrine, nor did it alter State property law regarding riparian ownership. The effect of the Act was merely to confirm the States' title to the beds of navigable waters within their boundaries as against any claim of the United States Government. As merely a declaration of the States' preexisting rights in the riverbeds, nothing in the Act in any way mandates, or even indicates, that federal common law should be used to resolve ownership of lands which, by the very terms of the Act, reside in the States.

---

[9]*California I*, 457 U.S. at 282 (quoting *Wilson*, 442 U.S. at 670).

429 U.S. at 371 n.4.

Together, *Corvallis* and *California I* indicate that the SLA's affect on choice of law is dependent on the character of the property at issue. If property surrounding an inland waterway is at issue, then the SLA's operation is to confirm that title to the bed of the waterway up to the waterway's OHWM lies with the State.[10] The fact that the SLA excepts relictions from its confirmation of title does not bar the adoption of state law as the rule of decision. Rather, it merely speaks to what property Congress believed was vested in States at the time each State entered the Union, not what property actually did vest or who would own future relictions. If, on the other hand, property surrounding the territorial sea is at issue, then the SLA's operation is to grant States title to certain lands beneath the territorial sea.[11] Because the SLA excepts relictions from this grant, it mandates the use of a federal rule of decision. *California I*, 457 U.S. at 283.

### 3.   *Whether Louisiana Law Should be Adopted as the Rule of Decision*

Because this case is not governed by *California I*, the Court must apply the balancing test in *Wilson v. Omaha Indian Tribe* to determine whether Louisiana law should be adopted as the rule of decision: "[The Court] should consider whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state

---

[10]Section 3 states in pertinent part: "It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States . . . are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto . . . ." 43 U.S.C. § 1311(a).

[11]Section 5 states in pertinent part: "There is excepted from operation of [Section 3] . . . all tracts or parcels of land together with all [relictions] thereto . . ., [and] all lands expressly retained by . . . the United States when the State entered the Union . . . ." 43 U.S.C. § 1313.

law." 442 U.S. at 672-73. Stated another way, "[r]efusing to apply state law is appropriate when national uniformity is required, as well as when state law conflicts with federal interests." *Central Pines Land Co. v. United States*, 274 U.S. F.3d 881, 890 (5th Cir. 2001).

The United States fails to articulate a reason why national uniformity is required, or a federal interest, other than a pecuniary one, that conflicts with state law. "[T]he government's mere 'interest in adding funds to the Treasury is not sufficient to bar adoption of state law.'" *Waterfowl Ltd. Liab. Co. v. United States*, 473 F.3d 135, 144 (5th Cir. 2006) (quoting *Central Pines*, 274 F.3d at 893). Furthermore, under Louisiana law, mineral rights do not exist as a separate perpetual estate in land, but can only be held separate from the surface land in the form of a mineral servitude. *See Frost-Johnson Lumber Co. v. Salling's Heirs*, 91 So. 207, 245 (La. 1920). Many of the United States' claims involve situations where the United States granted surface rights to private entities and reserved mineral servitudes. If federal common law is used as the rule of decision, then the United States may acquire greater rights than private surface owners who are subject to Louisiana law. Private surface owners, therefore, could be treated differently depending whether the United States owns a mineral servitude on their land.

The Court finds that all three factors of the *Wilson* balancing test favor adoption of Louisiana law as the rule of decision, and, therefore, adopts Louisiana law as the rule of decision to determine ownership of the alleged relictions.

### 4.   *Louisiana Law as Applied to the Lake*

In *Sapp v. Frasier*, the Louisiana Supreme Court held that, prior to the time the case was decided in 1899, the annual recession of Lake Bistineau's water level did not create relictions as defined by the Louisiana Civil Code. 26 So. 378, 380-81 (La. 1899). However, the parties do not

indicate, and the Court has no way of knowing, whether the character of the recession of the water level prior to 1899 is the same as the character of the recession of the water level after that date. Therefore, the Court declines to rule on whether Louisiana law holds that Louisiana owns title to the alleged relictions.

## C.     ESTOPPEL

Louisiana also asserts, as does Cohort, that the United States should be estopped from claiming ownership of the alleged relictions. They submit 14 letters from various employees of the United States to show that the United States has historically represented that Louisiana owned the bed of the lake up to the 1812 OHWM and that no claim would be asserted by the United States to those lands.[12] Louisiana and Cohort assert that they relied and acted upon those representations by entering into sales and leases with private parties and in deciding not to make claims to land under the Swamp Act of 1849 and the Swamp Lands Act of 1850.

> Equitable estoppel is a doctrine that is rarely valid against the government. Courts have applied estoppel to the federal government in only the narrowest of circumstances. To establish estoppel against the government, a party must provide affirmative misconduct by the government and also establish the four traditional elements of the doctrine. The four elements of estoppel are: (1) that the party to be estopped was aware of the fact, and (2) intended his act or omission to be acted upon; (3) that the party asserting estoppel did not have knowledge of the facts, and (4) reasonably relied on the conduct of the other to his substantial injury.

*United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997) (internal citations and quotations omitted).

The United States contends, among other things, that it did not commit affirmative misconduct. "'Affirmative misconduct' requires an affirmative misrepresentation or affirmative

---

[12]For example, a letter dated January 13, 1939, from Antoinette Frank, Assistant Commisioner of the GLO, stated that "[n]o claim will be made by the Government to any portion of the actual bed of the lake as it existed [in 1812]. [Doc. No. 144, Exhibit D].

concealment of a material fact by the government." *Linkous v. United States*, 142 F.3d 271, 278 (5th Cir. 1998) (citing *Carillo v. United States*, 5 F.3d 1302, 1306 (9th Cir. 1993)). It requires "more than mere negligence, delay, inaction, or failure to follow an internal agency guideline." *Mangaroo v. Nelson*, 864 F.2d 1202, 1204-05 (5th Cir. 1989). "Although courts have been less than forthcoming in defining what a government official must do to satisfy the affirmative misconduct element of an estoppel defense, the cases support the conclusion that at minimum the official must intentionally or recklessly mislead the estoppel claimant." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1350 (5th Cir. 1996).

The United States, in letters dated between 1929 and 1957, relied on its interpretation of the law and court precedent, as it existed between those dates, to determine that Louisiana owned the bed of the lake up to the 1812 OHWM and to state that it would not assert a claim to those lands. Louisiana and Cohort present no evidence that such conduct was reckless or intentional. The Court finds that the United States did not commit affirmative misconduct, and, therefore, is not estopped from asserting a claim of ownership to the alleged relictions.[13]

## III.  CONCLUSION

For the foregoing reasons, Louisiana's Motion for Summary Judgment [Doc. No. 142] is GRANTED IN PART and DENIED IN PART. It is GRANTED IN PART, and the Court finds that Louisiana law applies as the rule of decision to determine ownership of the alleged relictions. It is DENIED IN PART, and the Court finds that the United States is not estopped from claiming ownership of the alleged relictions. The Court, however, declines to rule whether Louisiana owns

---

[13] Because the Court finds that the United States did not commit affirmative misconduct, it need not decide whether the parties have satisfied the traditional elements of estoppel.

title to the alleged relictions under Louisiana law. For the same reasons, Cohort's Motion for Summary Judgment [Doc. No. 144] is DENIED.

MONROE, LOUISIANA, this 20 day of January, 2010.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

13